UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| CINDY HALL as PERSONAL REPRESENTATIVE of the ESTATE OF WOODROW AARON MULLINS, <br><br> Plaintiff, <br><br> v. <br><br> VANESSA J. HINOJOSA, *et al.*, <br><br> Defendants. | Case No. 22-11321 <br> Honorable Laurie J. Michelson |

**OPINION AND ORDER GRANTING
DEFENDANTS' MOTION TO DISMISS [21]**

In March 2020, Woodrow Mullins died by suicide in his prison cell at the Macomb Correctional Facility (MRF). (ECF No. 1, PageID.12–15.) Believing that at least 10 MRF officers were both grossly negligent and violated Mullins' rights under the Eighth Amendment, Mullins' Estate sued on his behalf. (*See generally* ECF No. 1.)

In short order, Defendants moved to dismiss the case in its entirety. (ECF No. 21.) For the reasons that follow, the Court will grant the motion to dismiss.

I.

Because Defendants seek dismissal under Federal Rule of Civil Procedure 12(b)(6), the Court accepts the factual allegations in the Estate's complaint as true and draws reasonable inferences from those allegations in its favor. *See Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 440 (6th Cir. 2020).

In September 2019, Mullins was taken into the custody of the Michigan Department of Corrections following a criminal conviction. (ECF No. 1, PageID.6.) Shortly thereafter, he was screened, assessed, and classified by the MDOC. (*Id.* at PageID.7.) Mullins' MDOC file noted that he suffered from "severe psychological problems," contained information about numerous prior suicide attempts, and indicated that he needed psychotropic medications for "mental/mood disorders and other mental health conditions." (*Id.*)

In December 2019, Mullins was transferred to MRF. (ECF No. 1, PageID.8.) Upon his arrival, he was screened again—this time by Defendant Vanessa Hinojosa. (*Id.*) Despite the fact that "she was and/or should have been aware of" Mullins' mental health needs, "she did nothing to ensure that [he] was given prompt medical and/or mental health attention." (*Id.*) And then she assigned him to general housing rather than housing where he could be "appropriately monitored to prevent self-injurious behavior[.]" (*Id.* at PageID.8–9.) And Defendant Alan Greason "rubber stamped" the housing assignment despite also knowing of Mullins' mental health needs. (*Id.* at PageID.9.)

The Estate alleges that, during Mullins' three months at MRF, each defendant knew that he was "extremely depressed all the time" and that he was involved in a "turbulent relationship with his significant other." (ECF No. 1, PageID.10.) Indeed, according to the Estate, "his fragile mental health condition was obvious[.]" (*Id.*) Even so, nowhere does the complaint suggest that Mullins ever informed anyone at MRF—

let alone any defendant—that he needed mental-health services or that he had a desire to harm himself. (*See generally* ECF No. 1.)

Nonetheless, Mullins frequently communicated his anger, hopelessness, and depression over phone calls and JPAY messages, which were monitored by Defendant P.C. Kinner and other MDOC officers. (*Id.*) In February 2020, Kinner overheard at least three such calls. (*Id.*) Rather than help Mullins, the Estate says that Kinner issued him a misconduct that restricted his phone privileges for 30 days. (*Id.* at PageID.12.)

Tragically, on March 9, 2020, Mullins hanged himself in the locker of his cell. (ECF No. 1, PageID.15.) In the prior 24 hours, Mullins sent several JPAY messages in which he made "various life-ending statements that clearly evidenced not only his extremely depressed state, but his clear intent to end his life within the next [24-hour] period." (*Id.* at PageID.12.) And he spoke with MRF Warden Willis Chapman (who is also a defendant) to express his "obvious distress" that "his visits had been restricted due to alleged misconduct." (*Id.* at PageID.13.)

The Estate attributes Mullins' death to the gross negligence and deliberate indifference of Hinojosa, Greason, Kinner, and Chapman. But it believes that other officers share the blame. In particular, it says that "it was requested that Defendant [and MDOC psychologist Kristy] Eelbode assess and treat [Mullins'] deteriorating mental health . . . but she refused[.]" (ECF No. 1, PageID.4, 14.) And it says that Defendants William Ortega, Dwayne Perry, and Matthew Nguyen failed to follow MRF policy when they conducted an improper headcount on the morning of Mullins'

3

suicide and did not properly investigate his "absence" from his cell. (*Id.* at PageID.14.) And finally, the Estate says that Warden Chapman, Deputy Warden George Stephenson, and Deputy Warden Kristopher Steece were aware that the headcounts "were not being done and/or not being done correctly, but did nothing about it" prior to Mullins' death. (*Id.* at PageID.10.) The Estate suggests that a proper headcount might have saved Mullins' life, perhaps by permitting someone to render timely aid or by preventing Mullins' suicide attempt altogether. (*Id.*)

So Mullins' Estate sued these and other unnamed officers, alleging claims for violations of the Eighth Amendment, *Monell* and supervisory liability, and gross negligence. (*See* ECF No. 1.) Defendants moved to dismiss for failure to state a claim or, alternatively, because they are entitled to qualified immunity. (*See generally* ECF No. 21.) Given the adequate briefing, the Court considers the motion without further argument. *See* E.D. Mich. LR 7.1(f).

## II.

In deciding a motion to dismiss, the Court "construes the complaint in the light most favorable" to the Estate and determines whether its "complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *See Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Detailed factual allegations are not required to survive a motion to dismiss, *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 614 (6th Cir. 2012), but they must "raise a right to relief above the speculative level," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). What

4

is plausible is "a context-specific task" requiring this Court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

### III.

### A.

The Court starts with the Estate's Eighth Amendment claims.[1] The Estate brings deliberate-indifference and cruel-and-unusual-punishment claims against each of the officers in their individual and official capacities. (ECF No. 1, PageID.1.) Before turning to the merits of these claims, the Court addresses two threshold issues.

First, Defendants say that Count I (alleging deliberate indifference to a serious medical need) and Count II (alleging cruel and unusual punishment by failing to provide necessary medical treatment) are redundant. So they ask the Court to dismiss Count II. (ECF No. 21, PageID.157–158.) The Estate responds only by saying that the "Court is not required to dismiss or strike Count II in the event it believes it is redundant of Count I. Plaintiff requests that Count II not be dismissed or stricken." (ECF No. 25, PageID.209.) But that is not enough reason to let Count II survive. As the Supreme Court has explained, one way that prison officials can inflict cruel and unusual punishments on prisoners is by being deliberately indifferent to their serious medical needs, so Count I and Count II are, in substance, the same. *See Farmer v.*

---

[1] The complaint also referenced Mullins' rights under the Fourteenth Amendment. (ECF No. 1, PageID.15.) But the Fourteenth Amendment only applies to pre-trial detainees, and Mullins had been convicted before entering MRF. *See, e.g., Brawner v. Scott Cnty., Tennessee*, 14 F.4th 585, 591 (6th Cir. 2021).

5

*Brennan*, 511 U.S. 825, 832 (1994). And the Estate does not explain how they could be different. As such, the Court will dismiss Count II. *See also Obomanu v. Warren*, No. 17-11435, 2018 WL 3020525, at *3 (E.D. Mich. June 18, 2018) ("[A]lthough plaintiff has plead separate 'deliberate indifference' claims . . . [and] a 'cruel and unusual conditions of confinement' claim . . . they are more appropriately considered a single claim." (citing *Wilson v. Seiter*, 501 U.S. 294, 303 (1991))).

Second, though the Estate brought claims for money damages against the officers in their official capacities, the parties now agree that the Eleventh Amendment bars such claims. (ECF No. 21, PageID.162–163; ECF No. 25, PageID.212.) So the official-capacity claims will be dismissed.

Now to the merits. The Eighth Amendment's prohibition of cruel and unusual punishments requires prison officials to "ensure that inmates receive adequate food, clothing, shelter, and medical care, and [to] take reasonable measures to guarantee the safety of the inmates." *Zakora v. Chrisman*, 44 F.4th 452, 467 (6th Cir. 2022) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). As already explained, an officer violates the Eighth Amendment when he acts with "deliberate indifference to an inmate's serious medical needs." *Brawner v. Scott Cnty., Tennessee*, 14 F.4th 585, 591 (6th Cir. 2021). A viable Eighth-Amendment claim has both an objective and subjective prong, requiring the inmate to show that (1) he had an objectively serious medical need, and (2) "an official knew of [his] serious medical need and that, despite this knowledge, the official disregarded or responded unreasonably" to it. *See Downard for Est. of Downard v. Martin*, 968 F.3d 594, 600 (6th Cir. 2020).

6

The Court assumes—and Defendants do not dispute—that Mullins' "mental/mood disorders and other mental health conditions" were sufficiently serious to satisfy the objective prong. (ECF No. 21, PageID.147); *see Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 482 (6th Cir. 2020) ("Psychological needs may constitute such 'serious medical needs' particularly when those psychological needs 'result in suicidal tendencies.'" (quoting *Horn v. Madison Cnty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994))).

That leaves the subjective prong. The subjective prong requires that a defendant had a "sufficiently culpable state of mind" to be deliberately indifferent, which is "equivalent to criminal recklessness." *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013) (internal quotation marks omitted). And because "each official's liability must be based solely on that official's own knowledge and actions, [courts] consider the subjective prong for each defendant separately." *Zakora*, 44 F.4th at 472. To satisfy this prong, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (applying this standard at the motion-to-dismiss stage).

An official's subjective knowledge may be inferred from the fact that an inmate's "substantial risk" of harm was "obvious." *Downard*, 968 F.3d at 600. But the Sixth Circuit also recognizes that "[s]uicide is a difficult event to predict and prevent and often occurs without warning." *Nallani v. Wayne Cnty.*, 665 F. App'x 498, 509 (6th Cir. 2016). So in the prisoner-suicide context, a plaintiff must clear a "high bar": "it must have been obvious that there was a 'strong likelihood' an inmate would

7

attempt suicide." *Downard*, 968 F.3d at 600 (quoting *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005)). This showing "typically requires evidence that the inmate was already on suicide watch, previously attempted suicide under similar conditions, or recently expressed a desire to self-harm." *Id.* (citing *Grabow v. County of Macomb*, 580 F. App'x 300, 309 (6th Cir. 2014) (collecting cases)).

The complaint fails to satisfy the subjective prong as to any defendant.

1.

For starters, the complaint makes a few general allegations about all "Defendants" that fail to satisfy the subjective prong. For example, it says that Mullins "was extremely depressed all the time and was involved in a turbulent relationship with his significant other, which was known to Defendants; was withdrawn and distraught, which was also known by Defendants; and his fragile mental health condition was obvious to Defendants and to all those who came in contact with him[.]" (ECF No. 1, PageID.10.) But the complaint provides no factual basis to support the assertion that all Defendants knew of Mullins' mental state or his relationship with his significant other. So these allegations are conclusory and thus not entitled to the presumption of truth. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Further, "despondency following an arrest is normal and does not suggest a 'strong likelihood' of suicide." *Downard for Est. of Downard v. Martin*, 968 F.3d 594, 601 (6th Cir. 2020). Again, "it is not enough to establish that an official may have acted with deliberate indifference to some *possibility* of suicide, or even a *likelihood* of suicide; the test is a *strong likelihood* of suicide." *Galloway v. Anuszkiewicz*, 518 F.

8

App'x 330, 336 (6th Cir. 2013). So these generic allegations do not lead to the plausible inference that any defendant knew that Mullins had a strong likelihood of committing suicide.

With the general allegations out of the way, the Court will consider the allegations about a particular defendant or group of defendants.

**2.**

Start with Hinojosa and Greason. The complaint alleges that, upon Mullins' arrival at MRF, Hinojosa "was and/or should have been aware of" Mullins' mental health needs, but she did nothing to ensure that he received prompt medical attention. (ECF No. 1, PageID.8–9.) Instead, she assigned him to general housing rather than placing him somewhere with more mental health services and monitoring. (*Id.*) And the complaint alleges that Greason "rubber stamped" the housing assignment despite also knowing of Mullins' mental health needs. (*Id.* at PageID.9.)

This is not sufficient. "[A]n official's failure to alleviate a significant risk that *he [or she] should have perceived but did not*" cannot constitute a violation of the Eighth Amendment. *See Farmer*, 511 U.S. at 838 (emphasis added). Moreover, knowledge of an inmate's psychiatric and mental health conditions is not knowledge of a "strong likelihood [that] an inmate would attempt suicide." *See Downard*, 968 F.3d at 600. Indeed, Hinojosa and Greason placed Mullins in general population three months prior to his death. At most these Defendants were negligent when they assigned Mullins to general population housing without making efforts to address his

9

mental health needs, but that is not enough to state a claim for deliberate indifference. *See Grabow v. Cnty. of Macomb*, 580 F. App'x. 300, 304, 310 (6th Cir. 2014) (concluding that prison official's failure to take note of an electronic "alert" based on the inmate's previous "suicide watch status" did not amount to deliberate indifference when that official changed the inmate's housing assignment).

So these claims will be dismissed.

### 3.

The claim against Kinner fails for similar reasons. The Estate alleges that Kinner monitored at least three phone calls in February 2020 where Mullins expressed "anger and hopelessness" as well as a "depressed mood," but did nothing to help him. (ECF No. 1, PageID.10.) And it alleges that Kinner issued a misconduct to Mullins that resulted in his telephone privileges being restricted for 30 days, presumably worsening his depression and feelings of isolation. (*Id.*)

But as explained, "despondency following an arrest is normal and does not suggest a 'strong likelihood' of suicide." *Downard*, 968 F.3d at 601. And there are no allegations that the recipient of these calls ever expressed concerns about Mullins to anyone at MRF.

For the first time in its response brief, the Estate asks this Court to infer that Kinner read the JPAY messages that Mullins sent in the hours before his death indicating an intent to end his life. (ECF No. 25, PageID.199.) But the complaint does not support such an inference because it does not allege that Kinner (or anyone else) read the messages prior to Mullins' death. *See* (ECF No. 1, PageID.12); *In re*

10

*Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 467 (6th Cir. 2014) ("Whether [plaintiff] *could* allege some facts to support a claim is not important; what is paramount at the motion-to-dismiss stage is whether [plaintiff] *did* allege sufficient facts in the Complaint."). In fact, it does not even allege that Kinner worked any shifts during the relevant timeframe such that he had an opportunity to read the messages. It is simply a step too far to suggest that because Kinner read some of Mullins' JPAY messages in February 2020, he had knowledge of any particular message in the critical, hours-long window preceding Mullins' death. *See Iqbal*, 556 U.S. at 678 (noting that the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully"); *see also Whitley v. Michigan Dep't of Corr.*, No. 1:22-CV-448, 2022 WL 16847679, at *2 (W.D. Mich. Nov. 10, 2022) (granting motion to dismiss where the estate alleged that inmate left a suicide note in the prison's healthcare box but failed to allege whether or how any defendant knew about the note).

Without that inference, there are no allegations to suggest that Kinner was subjectively aware of "a *strong likelihood*" that Mullins would commit suicide. *See Galloway v. Anuszkiewicz*, 518 F. App'x 330, 336 (6th Cir. 2013). So Kinner will be dismissed.

### 4.

So too with Warden Chapman. The complaint alleges that Mullins spoke with Chapman on the morning of his suicide, and that Mullins was "upset because his visits had been restricted due to alleged misconduct." (ECF No. 1, PageID.13.) And it

11

continues: "it would have been obvious to . . . Chapman that [Mullins] was despondent, upset, and in need of immediate mental health treatment." (*Id.*) (The allegations against Chapman related to prisoner headcounts are addressed below.)

Again, even assuming Chapman subjectively perceived Mullin's distress and despondency, that would not be enough for him to be deliberately indifferent to a strong likelihood of suicide. *See Downard*, 968 F.3d at 601 (noting that finding a strong likelihood of suicide "typically requires evidence that the inmate was already on suicide watch, previously attempted suicide under similar conditions, or recently expressed a desire to self-harm"). Indeed, even taking the facts in the light most favorable to the Estate, the fact that Mullins was upset about visit restrictions in the near future might have weighed against a risk of suicide in Chapman's mind.

And the Estate's citation to *Myers v. Clinton County Correctional Facility* is inapt. No. 3:21-CV-00867, 2022 U.S. Dist. LEXIS 91005 (M.D. Pa. May 20, 2022), *report and recommendation adopted by*, *Myers v. Clinton Cty. Corr. Facility*, No. 3:21-867, 2022 U.S. Dist. LEXIS 120558, at *1 (M.D. Pa. July 8, 2022). In that case, the plaintiff stated a deliberate-indifference claim against officers at a prison after they provided her with a disposable razor and then left her unsupervised despite the fact that she "presented obvious signs of mental illness exhibited in part by her visual and auditory hallucinations." *Id.* at *13. So that plaintiff's mental health needs were much more obvious than Mullins'. Indeed, the complaint does not identify any signs of suicidal tendencies that would have been perceptible to Chapman beyond despondency. *Cf. Schultz v. Sillman*, 148 F. App'x 396, 398, 402 (6th Cir. 2005) (noting

12

that "suicidal gestures" that could have put the officer on notice of a risk of suicide in that case included the inmate crying, yelling, kicking his cell door, requesting emergency medical attention, and complaining of severe pain when defendant knew plaintiff had a history of attempting suicide due to pain).

So this claim against Chapman will be dismissed.

### 5.

And again with Eelbode. The complaint alleges that Eelbode, a prison psychologist, was "fully aware" of Mullins' "fragile and serious mental health condition" but failed to treat him. (ECF No. 1, PageID.13.) And it says that "it was requested" that Eelbode treat Mullins, but she "refused and/or otherwise failed to do so." (*Id.* at PageID.14.)

For the reasons already explained, this does not amount to an allegation that Eelbode was aware of facts from which the inference could be drawn that there was a strong likelihood that Mullins would commit suicide. *See Zakora v. Chrisman*, 44 F.4th 452, 467 (6th Cir. 2022). In fact, these allegations do not suggest that Eelbode ever met, treated, or even reviewed a file related to Mullins such that she had any subjective knowledge of his mental-health history or needs. And even assuming that "it was requested" that she treat Mullins, the allegations do not suggest that the request mentioned a risk of suicide. *See Grabow v. Cnty. of Macomb*, 580 F. App'x 300, 310 (6th Cir. 2014) ("Though Franks clearly failed to make inquiries required by her job duties, there is no evidence that she had any reason to suspect that those inquiries would reveal suicidal tendencies.").

13

This claim will be dismissed.

### 6.

The Estate's allegations against a group of officers who were responsible for conducting headcounts at MRF also fail. The complaint alleges that Ortega, Perry, and Nguyen "did not follow established policy directives or the MRF operating procedures when it came to inmate counts because they routinely failed . . . to verify an inmate's physical presence in the cell . . . and failed to perform a visual check of an inmate for signs of life and presence." (ECF No. 1, PageID.9–10.)

And, says the Estate, these failures occurred on the morning of Mullins' suicide. That morning around 10:30 a.m., Ortega and Perry "allegedly conducted a physical count" but when they went to Mullins' cell, neither Mullins nor his cellmate were there. (ECF No. 1, PageID.14.) Yet the officers failed to alert anyone of their absence. (*Id.*) It was not until around 11:30 a.m. that Nguyen verified the inaccurate count and determined that Mullins was not marked present anywhere on prison property. (*Id.*) At that point, Ortega investigated further and discovered Mullins' body. (*Id.*)

Even assuming these officers violated MRF policy by failing to conduct a proper headcount, "failing to follow internal policies, without more, does not constitute deliberate indifference." *See Burwell v. City of Lansing, Michigan*, 7 F.4th 456, 471 (6th Cir. 2021) (collecting cases). As the Sixth Circuit recently explained, even if an officer "could have and should have perceived [an inmate's medical needs] if he had followed . . . protocol for conducting the one headcount or followed up . . . there is no

14

liability under a deliberate-indifference standard for what is arguably only negligent conduct." *Young v. Campbell Cnty., Kentucky*, 846 F. App'x 314, 328 (6th Cir. 2021). In other words, "an ability to see [an inmate in distress] is not the same as actually seeing him in distress." *See Burwell*, 7 F.4th at 467. But the complaint here makes no allegations that any Defendant suspected that Mullins might attempt suicide or that they saw and ignored him when aid might have been rendered.

So these claims will be dismissed.

**7.**

Finally, and relatedly, the complaint raises claims against Warden Chapman and Deputy Wardens Stephenson and Steece pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978). (ECF No. 1, PageID.21.) It says that Chapman, Stephenson, and Steece "failed to train, discipline, and/or supervise employees responsible for inmates' treatment, custody, and care, and/or encouraged the employees under them to violate federal and state laws without regard to the constitutional rights" of inmates. (*Id.* at PageID.21.)

But Defendants argue that *Monell* does not provide a basis for failure-to-supervise or failure-to-train claims against individual officers under these circumstances. (ECF No. 21, PageID.164.) The Estate apparently concedes that point in its response, but it reframes the claims as against the officers in their supervisory capacity. (ECF No. 25, PageID.213–214 ("[T]he 'title' of Count IV can be amended to delete the word *Monell* so as to avoid undue confusion, if the Court believes same is necessary").)

15

Even reframed, the claims fail. Individual liability on a failure-to-train or supervise theory "must be based on more than *respondeat superior*, or the right to control employees." *Zakora v. Chrisman*, 44 F.4th 452, 475 (6th Cir. 2022) (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)). Instead, "supervisory liability requires some active unconstitutional behavior on the part of the supervisor." *Id.* (internal quotation marks omitted). So "at a minimum, the plaintiff must show that the defendant at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016) (internal quotation marks omitted).

The Estate has not satisfied this standard. For one, the complaint failed to allege underlying unconstitutional conduct by any officers for the reasons explained above. *See Koch v. Dep't of Nat. Res.*, 858 F. App'x 832, 839–40 (6th Cir 2021) ("Koch has not alleged any unconstitutional conduct; his failure to supervise and failure to train claims are dependent on his malicious prosecution and due process claims, which are inadequate."). For two, the bare allegations that these Defendants failed to train and discipline the other officers who performed the headcounts are not enough to state a claim against them. *Id.* ("[E]ven if Koch had sufficiently alleged a malicious prosecution claim [against the other defendants], his bare allegation that Zehringer, Meyer, Zody, and Barna 'encouraged and supported' malicious prosecution by failing to train and discipline is not enough—he must allege sufficient factual detail to make that claim *plausible*, as opposed to *possible*.").

16

Finally, the Estate's reliance on *Blackwell v. Madison County* is misplaced. *See* No. 15-1224, 2016 WL 126884, at *3 (W.D. Tenn. Jan. 11, 2016). In that case, the court concluded that the plaintiff had stated a claim against certain supervisors for imposing discipline on the plaintiff in violation of the Due Process Clause. *Id.* But the court specifically noted that it "render[ed] no opinion as to the merits of the due process claim, . . . as the Defendants have not presented any argument on that issue." *Id.* In contrast, Defendants here successfully argued against the underlying constitutional violations.

So these claims will be dismissed.

\* \* \*

In sum, the Estate has not stated an Eighth Amendment claim because the complaint failed to explain how any defendant subjectively knew that Mullins presented a strong likelihood of suicide and yet failed to act on that knowledge. *See Zakora*, 44 F.4th at 468 (holding that a deliberate-indifference claim following an inmate's death by drug overdose was insufficient because "[t]he complaint failed to . . . plausibly allege how any of the [police officers] came to obtain any knowledge about the prevalence of drugs at [the prison], how they ignored that knowledge, or how they failed to curb the introduction, spread, and usage of drugs" at the prison); *Whitley v. Michigan Dep't of Corr.*, No. 1:22-CV-448, 2022 WL 16847679, at *2 (W.D. Mich. Nov. 10, 2022) (dismissing prisoner-suicide case at the motion-to-dismiss stage because "it is not clear how any of the foregoing defendants would have had the

17

knowledge about Whitley [and his risk of suicide] that Plaintiff attributes to all of them").

So the Eighth Amendment claims will be dismissed.

### B.

That leaves the Estate's gross-negligence claims under Michigan law.

The Court's only basis for jurisdiction over these claims is supplemental jurisdiction. Now that the federal claims have been dismissed, the calculus for exercising supplemental jurisdiction has changed. "[A] federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims." *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 454 (6th Cir. 2014) (quoting *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006)). Instead, "the balance of considerations usually will point to dismissing the state law claims[.]" *Bell-Kachelski v. Michigan Prot. & Advoc. Serv., Inc.*, No. 17-2508, 2018 WL 6823769, at *3 (6th Cir. Sept. 10, 2018) (quoting *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996)). As this case is still in the pleading stage, the Court sees no reason to "needlessly decid[e] state law issues." *Moon*, 465 F.3d at 728.

The Court declines to exercise supplemental jurisdiction over the gross-negligence claims and dismisses them without prejudice.

## IV.

For the foregoing reasons, Defendants' motion to dismiss is GRANTED. (ECF No. 21.) A separate judgment will follow.

SO ORDERED.

Dated: January 25, 2023

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE
